NOTICE
This Order was filed under
Supreme Court Rule 23 and
is not precedent except in the
limited circumstances
allowed under Rule 23(e)(1).

2021 IL App (4th) 200022-U

NO. 4-20-0022

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
October 12, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| DERRELL MISEAN HIBBLER, | ) | No. 19CF221 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Scott D. Drazewski, |
| | ) | Judge Presiding. |

JUSTICE HOLDER WHITE delivered the judgment of the court.
Presiding Justice Knecht and Justice Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court affirmed in part, concluding (1) the State proved defendant
guilty beyond a reasonable doubt; (2) the trial court did not err when it permitted
Detective Klein to provide lay opinion testimony; however, the court erred when
it permitted Detective Klein to provide improper lay opinion identification
testimony, but the evidence was not closely balanced; and (3) trial counsel was
not ineffective for failing to file a motion to sever the charges.  The appellate
court vacated defendant's term of mandatory supervised release for unlawful use
of a weapon by a felon and remanded with directions.

¶ 2    Following a November 2019 trial, a jury found defendant, Derrell Misean

Hibbler, guilty of unlawful use of a weapon by a felon (720 ILCS 5/24-1.1(a) (West 2018)) and

two counts of reckless discharge of a firearm (720 ILCS 5/24-1.5(a) (West 2018)).  The jury

acquitted defendant of mob action (720 ILCS 5/25-1(a)(1) (West 2018)).  In January 2020, the

trial court sentenced defendant to seven years' imprisonment for unlawful use of a weapon by a

felon to run concurrent to consecutive three-year terms in prison on each count of reckless

discharge of a firearm. The court also ordered defendant to serve two years of mandatory supervised release (MSR) for unlawful use of weapon by a felon and one year of MSR for the two counts of reckless discharge of a firearm.

¶ 3 Defendant appeals, arguing (1) the State failed to prove him guilty beyond a reasonable doubt; (2) the trial court erred when it permitted Detective Klein to provide improper lay witness opinion testimony and identification testimony based on the video surveillance; (3) ineffective assistance of trial counsel for failing to file a motion to sever the unlawful use of a weapon by a felon charge from the other charges; and (4) the court improperly ordered defendant to serve two years of MSR for unlawful use of a weapon by a felon. For the following reasons, we affirm in part, vacate in part, and remand with directions.

¶ 4 I. BACKGROUND

¶ 5 In March 2019, the State charged defendant, by indictment, with (1) unlawful use of a weapon by a felon (720 ILCS 5/24-1.1(a) (West 2018)), (2) two counts of reckless discharge of a firearm (720 ILCS 5/24-1.5(a) (West 2018)), and (3) mob action (720 ILCS 5/25-1(a)(1) (West 2018)). The charges stemmed from a February 26, 2019, shooting near Franzetti's Pantry in Bloomington, Illinois.

¶ 6 A. Defendant's Jury Trial

¶ 7 At defendant's November 2019 jury trial, the trial court first addressed the State's intent to offer defendant's prior convictions for purposes of impeachment if defendant chose to testify. The State sought to introduce defendant's prior theft conviction in McLean County case No. 15-CF-1296 and his aggravated battery conviction in McLean County case No. 16-CF-864. The trial court asked defense counsel, "What is your intent as far as the potentially stipulating to the defendant having a prior felony without having the jury hear the precise nature of same?"

Specifically, the court inquired about a stipulation to defendant's conviction for aggravated battery in McLean County case No. 16-CF-864 where the State used the conviction as a predicate to charge defendant with unlawful use of a weapon by a felon. After speaking with defendant, defense counsel stated, "Judge, we would be willing to—we'd be willing to stipulate there is a felony conviction in lieu of the jury hearing the nature of the charge if that is permissible by the Court." The court responded, "Well, actually, it's up to the defense as opposed to the Court." Defense counsel then stipulated to the introduction of the felony conviction in McLean County case No. 16-CF-864, an element of the unlawful use of a weapon by a felon charge, in exchange for the jury not being informed as to the specific nature of the conviction. The court then granted the State's motion to offer defendant's other prior conviction in McLean County case No. 15-CF-1296 for purposes of possible impeachment.

¶ 8        Below, we summarize the relevant testimony elicited during defendant's jury trial.

¶ 9                    1. *John Orendorff*

¶ 10       John Orendorff testified that on February 26, 2019, he worked at Speed Lube located at the intersection of East Washington Street and North Clinton Street in Bloomington. Orendorff stated that around 1:30 p.m. on February 26, he stood on the north side of Speed Lube smoking a cigarette facing East Jefferson Street when he observed three black males walk across Clinton Street, then cross East Jefferson Street and enter an apartment building on East Jefferson Street across from Speed Lube. Orendorff then observed the three males exit the apartment a little while later wearing different clothes. Eventually, Orendorff watched the three males once more reenter the apartment. Orendorff later spoke to police and identified the apartment building the men went into. Orendorff testified he did not hear any gunshots and he had no idea what happened when he saw the men.

¶ 11                                    2. *Haynes Brothers*

¶ 12          Khamahja and Khawaunis Haynes both testified that on February 26, 2019, a little after 1 p.m., they were walking west on East Washington Street to Franzetti's Pantry when they heard gunshots and both "ducked." Khamahja testified he and his brother, Khawaunis, were across the street from Franzetti's Pantry on the north side of East Washington Street when they were shot at. Khamahja did not see who shot at him but stated the shots came from his "right side." Khamahja testified that in response to the shooting he drew his firearm. Khamahja carried a valid firearm owners identification (FOID) card and valid conceal carry permit. After Khamahja pulled his firearm out he did not see anyone, so he ran toward where the shots came from. When he did not see anyone, he eventually went back to his mom's house on East Washington Street and his brother went to Franzetti's Pantry. Khamahja spoke with police after the incident and told police the individual who shot at him was wearing a gray sweater. On cross-examination, Khamahja denied telling police that on the day of the shooting he saw "two light-skinned black males."

¶ 13          Khawaunis testified that after he ducked, he did not see where the gunshots came from nor who shot at him. Khawaunis then followed his brother who ran toward the gunshots. Specifically, Khawaunis and his brother ran toward a car wash. After not finding the shooter, the brothers turned around, and Khawaunis went to Franzetti's Pantry. Khawaunis subsequently spoke with police.

¶ 14                                    3. *Responding Police Officers*

¶ 15          Around 1:30 p.m. on February 26, 2019, police officers responded to a shots fired call around Franzetti's Pantry and the Speed Lube on East Washington Street in Bloomington. Alex Freshour, a Bloomington police officer, testified that when he arrived on scene, he spoke

with Khamahja whom he believed to be the shooting suspect and took a firearm from him. While Officer Freshour spoke with Khamahja, other officers spoke with Khawaunis. Officer Freshour testified Khamahja told him "he saw two light-skinned black males."

¶ 16 Pedro Diaz, a Bloomington police officer, testified that when he responded to the scene, he went and spoke with a mechanic at Speed Lube. After speaking with the mechanic, Officer Diaz helped set up a perimeter around 706 East Jefferson Street, Apartment 5, where witnesses reported seeing suspects running into the apartment. Officer Diaz testified that once police set up the perimeter, they attempted to contact the occupants of the apartment. Eventually, Lar-Darius Carroll exited the apartment after his mother contacted him. Later, defendant and Tiquan Hamer exited the apartment. Officer Diaz testified he was present when defendant exited the apartment, and Officer Diaz identified defendant in court. Police obtained a search warrant for the apartment and determined no other individuals were inside.

¶ 17 Kiel Nowers, a Bloomington police officer, testified he was familiar with the area around Franzetti's Pantry and Speed Lube. The State admitted a Google map of the area through Officer Nowers. Officer Nowers identified the building north of Franzetti's Pantry, across an empty lot, as a car wash. Officer Nowers also identified 706 East Jefferson Street as an apartment building north of the Speed Lube across East Jefferson Street. Officer Nowers testified he helped establish a perimeter around 706 East Jefferson Street, Apartment 5. Eventually, Officer Nowers attempted to contact the occupants of the apartment by knocking on the apartment door. When no one responded, officers tried to open the front door and discovered a chain on the inside of the door. Officer Nowers testified the occupants eventually exited the apartment and were placed under arrest.

¶ 18 4. *Detective Tyrel Klein*

¶ 19        Tyrel Klein, a detective with the Bloomington Police Department, testified he began working for the Bloomington Police Department in 2013. Detective Klein started as a patrol officer, then worked as a patrol officer in the street crimes unit dealing with investigations involving gangs, drugs, and violence. He then became a detective, which he had been for almost a year. Detective Klein acknowledged he had been assigned to quite a few firearms cases. Detective Klein stated he trained with his firearm once a month as part of the special weapons and tactics (SWAT) team.

¶ 20        Detective Klein testified that on February 26, 2019, a supervisor designated him the lead investigator on this case. First, Detective Klein interviewed the Haynes brothers at the Bloomington Police Department. Then, a couple hours later, Detective Klein went down to Franzetti's Pantry to collect video surveillance. Detective Klein obtained and watched video recordings from Franzetti's Pantry and a Connect Transit bus. The State admitted and published the video recordings from Franzetti's Pantry and the Connect Transit bus through Detective Klein.

¶ 21        First, the State played "channel 4" of the video recording, which depicted the inside of Franzetti's Pantry on February 26, 2019. In the video recording, three black males can be seen walking around the store. After the State played the video recording, Detective Klein testified he recognized defendant in the video wearing a gray hooded sweatshirt. Detective Klein then identified defendant in court. In the video recording, Detective Klein also identified Tiquan Hamer wearing a black hooded sweatshirt and Lar-Darius Carroll wearing a sweatshirt with a shiny design on the front and wearing glasses. The State asked Detective Klein if he noticed anything of interest in the video recording. Detective Klein responded defendant's sweatshirt pocket appeared to have an object in it. Defense counsel objected to this testimony on the basis

that it was speculation and drew an opinion. Further, defense counsel argued Detective Klein was not present at the time of the video recording and never searched defendant. The trial court overruled the objection, stating Detective Klein could render an opinion as to what he believed he saw and then it was up to the jury to accept or reject his opinion. Detective Klein then testified defendant's "left sweatshirt pocket had a heavy object in it."

¶ 22 The State then played a video recording from "channel 5," which depicted the inside of Franzetti's Pantry on February 26, 2019, from another angle. After the State played the video recording, Detective Klein testified he recognized the same three individuals, defendant, Carroll, and Hamer, in the video recording. Detective Klein stated as defendant walked down an aisle toward the camera, the object in his left pocket leans forward and "it opens up the pocket to where you can see the top of it actually."

¶ 23 The State then played a video recording from "channel 8," which depicted another angle from the inside of Franzetti's Pantry on February 26, 2019. After the State played the video recording, Detective Klein testified he recognized defendant in the video recording and that in defendant's "left hooded sweatshirt pocket there's a pretty definitive outline of a heavy object." The State asked Detective Klein based on his "training and experience do you have an opinion as to what is in the [d]efendant's pocket?" Defense counsel objected based on speculation and that Detective Klein did not personally search defendant. The court overruled the objection, concluding it went to the weight to be given the testimony as opposed to the admissibility. Detective Klein then testified the object in defendant's pocket appeared to be a handgun. Specifically, Detective Klein stated, "The top portion of the slide is the weight that you see leaning forward. And then at the bottom of the pocket it looks like the handle grip of a pistol."

¶ 24        The State then played a video recording from "channel 1," which depicted the outside of Franzetti's Pantry on February 26, 2019. Specifically, the video recording showed the Franzetti's Pantry parking lot on February 26, 2019, when three men exit the store and walk through the parking lot. The State then replayed the video recording, paused it, and asked Detective Klein to identify the three men. Detective Klein identified Carroll in blue pants, Hamer in red pants, and defendant in a gray hooded sweatshirt with jeans.

¶ 25        The State then played a video recording from "channel 10," which depicted a wider view of the outside of Franzetti's Pantry on February 26, 2019. In the video recording, the same three individuals exit Franzetti's Pantry and walk north through the store's parking lot. The three individuals start to cross East Washington Street but stop in the middle of the street and turn their attention to the east. The three individuals then start to walk southeast on East Washington Street, in the direction they stopped to look. Then, the three individuals start to quickly walk north and cross back over East Washington Street to the sidewalk facing east. Abruptly, the three individuals turn and start to run. The three individuals split up with one individual running north and the other two running northwest through a vacant parking lot and then across North Clinton Street.

¶ 26        A short time later, two new individuals appear in the video running west on the north side of East Washington Street. The two new individuals walk on the sidewalk near the vacant parking lot, stop, and duck. Then, the two new individuals run north and northwest out of view, in the same direction the three individuals ran.

¶ 27        After the State played the video recording, Detective Klein testified that on the video recording he recognized the three individuals who exited Franzetti's Pantry as defendant, Carroll, and Hamer. Detective Klein recognized the two new individuals who enter the video

recording later as Khawaunis and Khamahja. Detective Klein testified he was familiar with Khawaunis and Khamahja because he interviewed them on February 26, 2019. Detective Klein testified he was familiar with defendant, Carroll, and Hamer based on watching the video recordings. Detective Klein testified the video recording showed Hamer and Carroll ran west/northwest across Clinton Street while defendant did not follow and instead "went north along the side of the building and ultimately to the alley not with the other two."

¶ 28    Last, the State played a video recording from a Connect Transit bus, which depicted the outside of Franzetti's Pantry as the bus drove by. After the State played the video recording, Detective Klein testified that based on the video recording he recognized Carroll, Hamer, and defendant standing on the sidewalk of East Washington Street as the bus passed. Detective Klein testified the bus video recording depicted the same area as the video recordings from Franzetti's Pantry. Detective Klein admitted to not being present at Franzetti's Pantry at the time of the video recordings and that he did not search defendant.

¶ 29    5. *Detective David Ashbeck*

¶ 30    David Ashbeck, a crime scene detective with the Bloomington Police Department, testified that on February 26, 2019, he collected physical evidence around the Clinton and Washington intersection by Franzetti's Pantry. Specifically, Detective Ashbeck collected two 9-millimeter caliber shell casings in the northeast corner of the car wash at 221 North Clinton Street. Detective Ashbeck recovered a bullet from a residence at 804 East Front Street where the bullet went through the east wall of the residence.

¶ 31    Detective Ashbeck also participated in the execution of the search warrant obtained for 706 East Jefferson Street, Apartment 5. Inside the apartment, Detective Ashbeck recovered a firearm that had been taken apart, resulting in three separate pieces being seized.

Detective Ashbeck found the magazine of the firearm in the bottom of a package of toilet paper, the handle in a plastic bag in the closet, and the slide in the bottom of a laundry basket. Detective Ashbeck also collected cell phones and a "couple other small things" from the apartment. Detective Ashbeck testified he believed one of the cell phones belonged to defendant. Detective Ashbeck later processed the firearm and found a fingerprint on the trigger that matched Tiquan Hamer. Detective Ashbeck testified he believed the apartment belonged to Hamer's girlfriend.

¶ 32                                6. *Detective Steven Moreland*

¶ 33        Steven Moreland, a detective with the Bloomington Police Department, testified regarding the firearm seized from 706 East Jefferson Street, Apartment 5. Detective Moreland identified the firearm as a "Smith & Wesson M&P Shield 9 millimeter." Detective Moreland testified he owned a .40-caliber M&P Shield and was familiar with the technique utilized to disassemble the weapon. Detective Moreland then disassembled the firearm seized from 706 East Jefferson Street, Apartment 5, showing that to remove the slide, the "trigger is depressed, the slide comes off." The State asked Detective Moreland "is your fingerprint currently on the trigger of that weapon?" Detective Moreland responded, "It should be." Detective Moreland also testified his fingerprint would be on the trigger if he fired the gun.

¶ 34                                7. *Stipulations*

¶ 35        The parties stipulated to the foundation and admission of surveillance videos obtained from Franzetti's Pantry and a Connect Transit bus. The parties also stipulated to the foundation and admission of defendant's February 26, 2019, police interview with Detective Jefferey Engle at the Bloomington Police Department. The trial court allowed defendant's February 26, 2019, police interview to be played for the jury.

¶ 36    During the February 26, 2019, police interview, defendant wore a blue sweatshirt with a white design on the front, black pants, and no shoes. Defendant identified himself in the interview and told Detective Engle he heard there were shots fired but he was not personally aware of the shooting. Defendant told Detective Engle that on the day of the shooting he went with Lar-Darius Carroll to a tattoo appointment. Defendant stated he remained in the car while Carroll received a tattoo and he could not provide details about Carroll's tattoo. When asked whether they went to a house or business for the tattoo, defendant responded, "I don't know, it was a house probably." Defendant identified Tiquan Hamer as his biological brother and stated Hamer's girlfriend lived at the apartment on East Jefferson Street.

¶ 37    Defendant also told Detective Engle he went to Franzetti's Pantry earlier in the day to get food and that he heard gunshots and ran to "the crib." Defendant stated he took off when he heard gunshots and did not know who shot them and did not see anyone. When asked why someone would shoot at him, defendant said he did not know and that there are cases of "mistaken identity."

¶ 38    Detective Engle asked defendant what he wore at Franzetti's Pantry earlier that day. Defendant responded, "Why does that matter?" Detective Engle then confronted defendant about having different clothing on than he wore at Franzetti's Pantry. In response, defendant questioned the detective stating, "How do you know what I was wearing?" Detective Engle then informed defendant to the presence of the video surveillance the police obtained. Defendant told Detective Engle he wore the same clothes he had on earlier at Franzetti's Pantry. The interview then ended.

¶ 39    The parties stipulated to the physical evidence, including two shell casings found at 221 North Clinton Street, a bullet recovered from 804 East Front Street, and a 9-millimeter

pistol recovered from 706 East Jefferson Street, Apartment 5. Dustin Johnson, an expert in firearms and toolmarks, tested and analyzed the physical evidence and determined the shells and bullet were fired from the recovered pistol. Last, the parties presented a joint oral stipulation to the jury that defendant had a prior felony conviction in McLean County case No. 16-CF-864. The trial court then instructed the jury that the joint oral stipulation "is evidence for you to consider. No other proof is needed. And in your role as factfinders you must accept those facts as true in the trial."

¶ 40                                  8. *Jury Deliberation and Verdict*

¶ 41            During deliberations, the jury sent a note to the trial court asking, "Channel 10, Can we watch video of shooting? We want to watch direction of runners[.]" The court responded, "Yes. People's Exhibit 4, which includes the video portion from Channel 10 you requested is being provided momentarily. A representative from the court will provide you with instructions on how to view the video on a laptop computer."

¶ 42            Following deliberations, the jury found defendant guilty of unlawful use of a weapon by a felon and two counts of reckless discharge of a firearm. The jury found defendant not guilty of mob action.

¶ 43                  B. Defendant's Posttrial Motions and Sentencing

¶ 44            On December 18, 2019, defendant filed a motion for judgment notwithstanding the verdict or, in the alternative, for new trial. In the motion, defendant alleged (1) the State failed to prove him guilty beyond a reasonable doubt and (2) the trial court erred in denying defendant's motion for directed verdict.

¶ 45            At a January 3, 2020, hearing, the trial court heard arguments on defendant's posttrial motion before sentencing defendant. Defense counsel argued the evidence was

insufficient to convict defendant of unlawful use of a weapon by a felon or reckless discharge of a firearm. Defense counsel also argued, "For any errors I would cite the ominous clause for any errors in the record the Court finds that new trial be ordered. Thank you." The trial court responded, "Okay. So any objection that was raised for which the objection, more specifically by defense counsel that was overruled, or any relief not requested by the defendant that was denied, that you're indicating that those form the basis then for me granting a new trial?" Defense counsel responded, "Yes." The State argued there was sufficient circumstantial evidence to convict defendant based on video surveillance from Franzetti's Pantry, the testimony from multiple police officers, and the ballistic evidence.

¶ 46    Ultimately, the court determined there was no basis for awarding a new trial where it correctly ruled on evidentiary matters. Further, the court denied defendant's motion for judgment notwithstanding the verdict finding the circumstantial evidence was sufficient to support defendant's convictions.

¶ 47    The court then sentenced defendant to seven years' imprisonment for unlawful use of a weapon by a felon to run concurrent to consecutive three-year terms in prison on each count of reckless discharge of a firearm. The court also ordered defendant to serve two years' MSR for unlawful use of weapon by a felon and one year MSR for the two counts of reckless discharge of a firearm.

¶ 48    This appeal followed.

¶ 49                                II. ANALYSIS

¶ 50    On appeal, defendant argues (1) the State failed to prove him guilty beyond a reasonable doubt; (2) the trial court erred when it permitted Detective Klein to provide improper lay witness opinion testimony and identification testimony based on the video surveillance;

- 13 -

(3) ineffective assistance of trial counsel for failing to file a motion to sever the unlawful use of a weapon by a felon charge from the other charges; and (4) the court improperly ordered defendant to serve two years of MSR for unlawful use of a weapon by a felon. We turn first to the sufficiency of the evidence.

¶ 51                                    A. Sufficiency of the Evidence

¶ 52          When considering the sufficiency of the evidence, we determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the required elements of the crime beyond a reasonable doubt. *People v. Bradford*, 2016 IL 118674, ¶ 12, 50 N.E.3d 1112. "It is the responsibility of the trier of fact to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts." *Id.* "Accordingly, a reviewing court will not substitute its judgment for the fact finder on questions involving the weight of the evidence or the credibility of the witnesses." *Id.* "A conviction will be reversed only where the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *People v. Belknap*, 2014 IL 117094, ¶ 67, 23 N.E.3d 325.

¶ 53          "Circumstantial evidence is sufficient to sustain a criminal conviction, provided that such evidence satisfies proof beyond a reasonable doubt of the elements of the crime charged." *People v. Hall*, 194 Ill. 2d 305, 330, 743 N.E.2d 521, 536 (2000). "The trier of fact need not, however, be satisfied beyond a reasonable doubt as to each link in the chain of circumstances. It is sufficient if all the evidence taken together satisfies the trier of fact beyond a reasonable doubt of the defendant's guilt." *Id.* (citing *People v. Jones*, 105 Ill. 2d 342, 350, 475 N.E.2d 832, 835 (1985)).

- 14 -

¶ 54        Defendant argues the State failed to present any evidence directly showing he fired or possessed a firearm, and the evidence failed to identify him as the shooter. The State argues that while it presented no eyewitness or video evidence of the actual shooting, a plethora of circumstantial evidence exists proving defendant's guilt. Specifically, the State presented circumstantial evidence in the form of video surveillance from Franzetti's Pantry, the Haynes brothers' testimony, multiple police officer's testimony, defendant's police interview, and physical evidence found at multiple locations near the scene of the shooting. We first turn to whether the State proved defendant guilty of two counts of reckless discharge of a firearm beyond a reasonable doubt.

¶ 55                        1. *Reckless Discharge of a Firearm*

¶ 56        To prove a defendant guilty of reckless discharge of a firearm (720 ILCS 5/24-1.5(a) (West 2018)), the State must present evidence to establish beyond a reasonable doubt that defendant (1) discharged a firearm in a reckless manner and (2) endangered the bodily safety of an individual. 720 ILCS 5/24-1.5(a) (West 2018). Here, defendant argues that while there is no serious dispute over the fact someone discharged a firearm in the direction of Khamahja and Khawaunis, or that doing so endangered their bodily safety, the State failed to present sufficient evidence to prove defendant discharged the firearm. We disagree and find adequate circumstantial evidence existed to prove defendant guilty of reckless discharge of a firearm beyond a reasonable doubt.

¶ 57        At trial, the testimony revealed that on February 26, 2019, a little after 1 p.m., Khamahja and his brother, Khawaunis, walked west on East Washington Street to Franzetti's Pantry when they heard gunshots and "ducked." Khamahja testified he did not see who shot at him but stated the gunshots came from his "right side."

- 15 -

¶ 58    Around 1:30 p.m. on February 26, 2019, Orendorff stood on the north side of Speed Lube smoking a cigarette facing East Jefferson Street when he observed three black men walk across Clinton Street, then cross East Jefferson Street and enter an apartment building on East Jefferson Street. Later, Orendorff observed those same three men exit the apartment building wearing different clothes. Orendorff then once more watched the three men reenter the apartment.

¶ 59    Responding officers testified to being dispatched around 1:30 p.m. on February 26, 2019, to the area around Franzetti's Pantry and the Speed Lube on East Washington Street for a shots fired call. Officer Nowers testified he was familiar with the area around Franzetti's Pantry and Speed Lube. Officer Nowers identified the building north of Franzetti's Pantry, across an empty lot, as a car wash. Officer Nowers also identified 706 East Jefferson Street as an apartment building north of the Speed Lube across East Jefferson Street.

¶ 60    Upon arrival at the scene, Officer Diaz spoke with a mechanic at Speed Lube. After speaking with the mechanic, Officer Diaz helped set up a perimeter around 706 East Jefferson Street, Apartment 5, where witnesses reported potential suspects running into the apartment. Both Officer Diaz and Officer Nowers testified that once the police set up the perimeter, they attempted to contact the occupants of the apartment. Eventually, Carroll, Hamer, and defendant exited the apartment. Police obtained a search warrant for the apartment and determined no other individuals were inside.

¶ 61    Detective Ashbeck testified he participated in the execution of the search warrant for the apartment and recovered a firearm that had been taken apart, resulting in three separate pieces being seized. Detective Ashbeck found the magazine of the firearm in the bottom of a package of toilet paper, the handle in a plastic bag in the closet, and the slide in the bottom of a

laundry basket. Detective Ashbeck later processed the firearm and found a fingerprint on the trigger that matched Hamer.

¶ 62        Detective Ashbeck also collected physical evidence around the Clinton and Washington intersection by Franzetti's Pantry. The parties stipulated to the physical evidence, including two shell casings found at 221 North Clinton Street, a bullet recovered from 804 East Front Street, and a 9 millimeter pistol recovered from 706 East Jefferson Street, Apartment 5. Firearms expert Johnson tested and analyzed the physical evidence and determined the shells and bullet were fired from the recovered pistol.

¶ 63        Further, the jury viewed video surveillance from inside and outside Franzetti's Pantry on the day of the shooting. Video recordings from inside Franzetti's Pantry show three black males enter the store a little before the shooting and walk around. In the video, one male wore a black hooded sweatshirt with red pants, another wore a sweatshirt with a shiny design on the front, blue pants, and glasses, and the third male wore a gray hooded sweatshirt with jeans. In the video recording, a bulge can be observed in the left sweatshirt pocket of the man with the gray sweatshirt. Detective Klein identified defendant in the video as the man wearing the gray hooded sweatshirt, Hamer as the man wearing the black hooded sweatshirt and red pants, and Carroll as the man wearing the sweatshirt with a shiny design, glasses, and blue pants. Detective Klein testified he observed a bulge in defendant's pocket and opined that, although he did not personally search defendant, the object in defendant's pocket appeared to be a handgun. Defense counsel objected, and the trial court overruled the objection, concluding it went to the weight to be given the testimony as opposed to the admissibility.

¶ 64        The jury also viewed video surveillance from outside Franzetti's Pantry. In the video recordings from outside the store, the three men eventually exit Franzetti's Pantry and

- 17 -

walk north through the store's parking lot.  The three men start to cross East Washington Street but stop in the middle of the street and turn their attention to the east.  The three men then start to walk southeast on East Washington Street, in the direction they stopped to look.  Then, the three men start to quickly walk north and cross back over East Washington Street to the sidewalk facing east.  Abruptly, the three men turn and start to run.  The three men split up, with the individual in the gray hooded sweatshirt running north and the other two individuals running northwest through a vacant parking lot and then across North Clinton Street.

¶ 65          A short time later, two new individuals appear in the video running west on the north side of East Washington Street.  The two new individuals walk on the sidewalk near the vacant parking lot, stop, and duck.  Then, the two new individuals run north and northwest out of view, in the direction the three men ran.  Detective Klein recognized the two new individuals who enter the video recording later as Khawaunis and Khamahja.  Detective Klein testified he was familiar with Khawaunis and Khamahja because he interviewed them on February 26, 2019.

¶ 66          The State argues the video surveillance corroborates the testimony of the Haynes brothers who both testified that on February 26, 2019, a little after 1 p.m., they were walking west on East Washington Street to Franzetti's Pantry when they were shot at.  The State asserts that while the video surveillance does not have audio, you can see the exact time the shooting occurred where the Haynes brothers both stopped and "ducked."  Khamahja initially testified he did not know who shot at him; however, he later stated that he told police the individual who shot at him was wearing a gray sweater.  Officer Freshour testified he spoke with Khamahja right after the shooting and Khamahja told him that at the time of the shooting "he saw two light-skinned black males."  Khamahja denied he told police that.

¶ 67 The jury also viewed a video recording of defendant's February 26, 2019, police interview with Detective Engle. The parties stipulated to the admission of the video recording. During the interview, defendant wore a blue sweatshirt with a white design on the front, black pants, and no shoes. Defendant told Detective Engle he went to Franzetti's Pantry on February 26, 2019, and ran to "the crib" when he heard gunshots. Defendant stated he did not know who shot at him and did not see anyone. Detective Engle confronted defendant about having different clothes on than what he wore at Franzetti's Pantry earlier in the day. Defendant asked Detective Engle, "How do you know what I was wearing?" Detective Engle then informed defendant about the existence of video surveillance. Defendant maintained he wore the same clothes he had been wearing earlier at Franzetti's Pantry.

¶ 68 The State argues that when viewing the evidence as a whole, it is apparent defendant discharged the firearm towards the Haynes brothers where the video surveillance showed defendant wore a gray sweatshirt and ran in the direction the shooting occurred while the other two males ran in a different direction. In the video surveillance from inside Franzetti's Pantry, the individual wearing the gray sweatshirt had a bulge in his pocket. Khamahja told police the individual who shot at him was wearing a gray sweater.

¶ 69 Further, when the three men exited Franzetti's pantry and eventually began running, the individual in the gray sweatshirt ran north and the other two individuals ran northwest through a vacant parking lot and then across North Clinton Street. A short time later, the Haynes brothers walked west on East Washington Street to Franzetti's Pantry when they were shot at. Khamahja testified the shots came from his "right side." The State argues the right side of Khamahja would have been the direction defendant ran.

¶ 70        Also, Detective Ashbeck later found two shell casings at 221 North Clinton Street, near where defendant ran. Firearms expert Johnson tested and analyzed the physical evidence and determined the shells and bullet were fired from the pistol recovered from the apartment at 706 East Jefferson Street. Police obtained a search warrant for the apartment and discovered no other individuals were inside besides defendant, Hamer, and Carroll.

¶ 71        The State acknowledges Detective Ashbeck found Hamer's fingerprints on the firearm but argues Hamer's fingerprints on the firearm could have resulted from disassembling the weapon where the weapon was found in three pieces. Detective Moreland demonstrated that to disassemble the weapon, an individual would need to place their finger on the trigger. The State asserts besides finding Hamer's fingerprint on the gun, no other evidence implicates him in the shooting where all the evidence viewed together implicates defendant in the shooting.

¶ 72        Defendant argues the evidence does not establish defendant discharged the firearm where his fingerprints were not found on the firearm. Rather, Detective Ashbeck identified Hamer's fingerprint on the firearm. Further, defendant contends Orendorff's testimony that he saw three men run into the East Jefferson Street apartment is inconsistent with the State's theory that defendant split up from his companions when they left Franzetti's Pantry. Defendant also questioned the credibility of the Haynes brothers' testimony. The State asserts that other than his fingerprint on the gun, no evidence implicates Hammer in the shooting. According to the State, all the evidence viewed together implicates defendant in the shooting.

¶ 73        When viewing the evidence as a whole, we find the State presented sufficient evidence to show defendant discharged a firearm in the direction of the Haynes brothers. Under the circumstances, the jury was in the best position to assess the credibility of the witnesses, weigh the evidence, and resolve any conflict or inconsistencies in the evidence. See *Bradford*,

2016 IL 118674, ¶ 12. Thus, where the jury viewed the video recordings from Franzetti's

Pantry, the video recording of defendant's police interview, and observed defendant in court, the

jury was in the best position to determine whether defendant was the man in the gray sweatshirt.

Accordingly, we find the jury, acting as a rational trier of fact, reasonably found defendant guilty

of two counts of reckless discharge of a firearm beyond a reasonable doubt. We next turn to

whether the State proved defendant guilty of unlawful use of a weapon by a felon beyond a

reasonable doubt.

¶ 74                                    2. *Unlawful Use of a Weapon by a Felon*

¶ 75             To prove defendant guilty of unlawful use of a weapon by a felon (720 ILCS

5/24-1.1(a) (West 2018)), the State must present evidence to establish beyond a reasonable doubt

that (1) defendant had a prior felony conviction and (2) defendant knowingly possessed a

weapon. 720 ILCS 5/24-1.1(a) (West 2018). We note, in this matter, the parties stipulated

defendant had a prior felony conviction in McLean County case No. 16-CF-864 and defendant

offers no challenge to the knowledge component of his alleged possession. Thus, we turn to

whether defendant actually or constructively possessed a firearm.

¶ 76             "Possession may be established by evidence of actual physical possession."

*People v. Alexander*, 202 Ill. App. 3d 20, 24, 559 N.E.2d 567, 569 (1990). To prove actual

possession, testimony must show that the defendant exercised physical dominion over the item in

question. *Id.* Possession may be inferred from circumstantial evidence. *People v. Peete*, 318 Ill.

App. 3d 961, 965, 743 N.E.2d 689, 692 (2001). In fact, "a conviction may be sustained wholly

upon circumstantial evidence." *Id.*

¶ 77             Defendant argues the State's theory of actual possession relies largely on the

argument presented above that defendant was the shooter along with the video recordings from

inside Franzetti's Pantry and Detective Klein's testimony. Defendant asserts Detective Klein's opinion that the bulge in defendant's sweatshirt pocket was a handgun was improper and speculative. Defendant provides the bulge could have been a cell phone where police found cell phones inside the apartment on East Jefferson Street.

¶ 78    We find when viewing the evidence presented at trial as a whole, the jury reasonably found defendant possessed the weapon where video recordings showed the man in the gray sweatshirt with a bulge in his sweatshirt pocket inside Franzetti's Pantry, then immediately after exiting the store, the man in the gray sweatshirt ran in the direction where police later recovered shell casings matching the firearm. Defendant was later apprehended in the apartment where police found the firearm. Further, Khamahja testified the shooter wore a gray sweater.

¶ 79    Where the jury viewed the video recordings from Franzetti's Pantry, the video recording of defendant's police interview, and observed defendant in court, we find they were in the best position to infer whether defendant was the man in the gray sweatshirt. Accordingly, as stated above, we will not substitute our judgment for the fact finder on questions involving weight of the evidence and credibility of the witnesses. See *Bradford*, 2016 IL 118674, ¶ 12. Therefore, when viewing the evidence in the light most favorable to the State, we find the State proved defendant guilty of unlawful use of a weapon by a felon beyond a reasonable doubt.

¶ 80    B. Lay Witness Opinion and Identification Testimony

¶ 81    Defendant next argues the trial court erred in allowing Detective Klein to testify to the identification of defendant, Carroll, and Hamer in the video recordings, as well as provide his opinion that in the video recordings defendant had a heavy object in his sweatshirt pocket that could be a handgun. The State disagrees and argues the trial court did not err in allowing

- 22 -

Detective Klein to testify about the identification of defendant and other events depicted in the video recordings. The State asserts Detective Klein's testimony was proper where it was helpful to the jury because of his position as lead investigator, his interview with the Haynes brothers, and his familiarity with the location depicted in the video surveillance.

¶ 82　　　To preserve an error for consideration on appeal, a defendant must object to the error at trial and raise the error in a posttrial motion. *People v. Sebby*, 2017 IL 119445, ¶ 48, 89 N.E.3d 675. Failure to do so constitutes forfeiture. *Id.* However, we may consider a forfeited claim where the defendant demonstrates a plain error occurred. Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). To prevail under the plain error doctrine, defendant must first demonstrate a clear and obvious error occurred. *People v. Piatkowski*, 225 Ill. 2d 551, 565, 870 N.E.2d 403, 410-11 (2007). If an error occurred, we will only reverse where (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error" or (2) the "error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Id.*

¶ 83　　　While defendant objected at trial to Detective Klein's testimony regarding his observation and opinion that defendant had an object in his sweatshirt pocket that resembled a handgun in the video recordings, defendant failed to object to Detective Klein's testimony identifying defendant in the video recordings. Further, defendant failed to raise either of these issues in a posttrial motion. Thus, defendant forfeited these issues on appeal. See *Sebby*, 2017 IL 119445, ¶ 48. We first turn to whether a clear or obvious error occurred when Detective Klein testified regarding his observation and opinion that in the video recordings, defendant had an object in his sweatshirt pocket that resembled a gun.

¶ 84                                    1. *Lay Witness Opinion Testimony*

¶ 85            Under Illinois Rule of Evidence 701, lay witness testimony "in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Ill. R. Evid. 701 (eff. Jan. 1, 2011). Under Illinois Rule of Evidence 702, testimony that is based on specialized knowledge may be given in the form of an opinion by "a witness qualified as an expert by knowledge, skill, experience, training, or education." Ill. R. Evid. 702 (eff. Jan. 1, 2011).

¶ 86            "[A] lay witness may testify to his observations or sensory perceptions." *People v. McCarter*, 385 Ill. App. 3d 919, 934, 897 N.E.2d 265, 279 (2008). However, it is ultimately up to the trier of fact to weigh the evidence and draw reasonable inferences from the facts. *Bradford*, 2016 IL 118674, ¶ 12.

¶ 87            Defendant argues Detective Klein's opinion testimony that he observed in the video recordings from inside Franzetti's Pantry that defendant had an object in his sweatshirt pocket that resembled a gun was improper. Additionally, defendant argues Detective Klein's opinion about the bulge in defendant's pocket was inadmissible to the extent the State attempted to base admissibility on Detective Klein's specialized knowledge without admitting him as an expert. The State argues the weight to be given to Detective Klein's lay opinion testimony was for the trier of fact to assess.

¶ 88            We note, to the extent Detective Klein's opinion about the bulge in defendant's pocket on the video recordings related to his "training and experience" as a police officer and working with firearms, the State failed to offer Detective Klein as an expert witness. Had the

State sought to offer Detective Klein as an expert witness, it is likely the request would have been granted.

¶ 89          However, we find Detective Klein's lay opinion testimony was admissible under Illinois Rule of Evidence 701 (eff. Jan. 1, 2011), where his testimony was (1) rationally based on his own perception of the video and (2) helpful for the jury to determine a fact at issue, whether defendant had an object in his pocket. Specifically, Detective Klein's testimony was helpful to the jury where he provided context and guidance as to the area around Franzetti's Pantry and explained to the jury the location of the shooting and assisted the jury in understanding the surrounding areas, the direction each individual ran in the video recordings, and how the position of each individual related to other individuals and the location of the shooting.

¶ 90          After Detective Klein viewed the video recordings from inside Franzetti's Pantry, the prosecutor asked him if he noticed anything out of the ordinary with any of the individuals. Detective Klein testified defendant's sweatshirt pocket appeared to have a heavy object in it. When counsel for the State asked Detective Klein what the object could be, defense counsel objected. In overruling the objection, the trial court concluded the objection went to the weight of the testimony as opposed to admissibility. Detective Klein testified the object in defendant's pocket appeared to be a handgun. Also, during cross-examination, defense counsel elicited that Detective Klein was not present at Franzetti's Pantry at the time of the video recording and that he did not personally search defendant.

¶ 91          Here, the prosecutor generally asked Detective Klein to provide his observations of the individuals in the video recordings. Based on his own perceptions, Detective Klein testified that defendant appeared to have a heavy object in his sweatshirt pocket and opined the object in defendant's pocket appeared to be a handgun where "[t]he top portion of the slide is the

weight that you see leaning forward. And then at the bottom of the pocket it looks like a handle grip of a pistol." At no point did Detective Klein offer an opinion identifying what he observed in defendant's pocket as a specific make, model, or type of handgun. Further, the trial court informed the jury "to the extent that the witness' observation which would be supported by the evidence he can render an opinion as to what he believes that he sees. Ultimately it's up to the trier of fact, the jury to either accept or reject that opinion because they are the factfinder and they are the ones who viewing this exhibit can and will make their own determination."

¶ 92 In this instance, Detective Klein could give his opinion as to what he observed in the video recording and it was up to the jury to weigh the evidence and to accept or reject his opinion. See *Bradford*, 2016 IL 118674, ¶ 12. Accordingly, defendant fails to demonstrate a clear or obvious error occurred when the trial court admitted Detective Klein's lay opinion testimony. We next address whether a clear or obvious error occurred when Detective Klein provided lay opinion testimony identifying defendant in video recordings.

¶ 93 2. *Lay Witness Opinion Identification Testimony*

¶ 94 a. Clear or Obvious Error

¶ 95 The Illinois Supreme Court in *People v. Thompson*, 2016 IL 118667, 49 N.E.3d 393, addressed the admissibility of lay opinion identification testimony. The supreme court determined lay opinion identification testimony is admissible where "(a) the testimony is rationally based on the perception of the witness and (b) the testimony is helpful to a clear understanding of the witness's testimony or a determination of a fact in issue." *Id.* ¶ 50 (citing Ill. R. Evid. 701 (eff. Jan. 1, 2011)). As it related to an identification from a surveillance recording, the court found,

"[l]ay opinion identification testimony is helpful where there is some basis for concluding the witness is more likely to correctly identify the defendant from the surveillance recording than the jury. A showing of sustained contact, intimate familiarity, or special knowledge of the defendant is not required. Rather, the witness must only have had contact with the defendant, that the jury would not possess, to achieve a level of familiarity that renders the opinion helpful." *Id.*

¶ 96 The court adopted a totality of the circumstances approach that considers the following factors "in determining whether there is some basis for concluding the witness is more likely to correctly identify the defendant." *Id.* ¶ 51. The factors are:

"[(1)] the witness's general familiarity with the defendant; [(2)] the witnesses' familiarity with the defendant at the time the recording was made or where the witness observed the defendant dressed in a manner similar to the individual depicted in the recording; [(3)] whether the defendant was disguised in the recording or changed his/her appearance between the time of the recording and trial; and [(4)] the clarity of the recording and extent to which the individual is depicted." *Id.*

However, the supreme court noted "the absence of any particular factor does not render the testimony inadmissible." *Id.*

¶ 97 Further, the supreme court in *Thompson* held "that when the State seeks to introduce lay opinion identification testimony from a law enforcement officer, the circuit court

should afford the defendant an opportunity to examine the officer outside the presence of the jury." *Id.* ¶ 59. The court stated, "This will provide the defendant with an opportunity to explore the level of the witness's familiarity as well as any bias or prejudice." *Id.*

¶ 98        In *Thompson*, the supreme court found the identification testimony of three witnesses was not admissible, and the trial court erred in admitting the testimony. *Id.* ¶ 66. One witness provided no basis to conclude he would be more likely to identify the defendant than the jury where there was "no testimony as to how long he had known defendant, how many times he had seen defendant, and under what conditions or circumstances he had seen defendant." *Id.* ¶ 63. Therefore, the court determined his testimony was inadmissible. *Id.* As to the other two witnesses, the court found their testimony inadmissible where they were law enforcement officers and the trial court failed to take the appropriate precautions before admitting their testimony. *Id.* ¶¶ 62, 65.

¶ 99        Here, Detective Klein's lay opinion testimony identifying defendant in the video surveillance was improper. Detective Klein testified he was familiar with defendant based on watching the multiple video recordings from Franzetti's Pantry. However, Detective Klein never had any prior contact with defendant where he did not interview him or interact with him on the day of the shooting. Rather, Detective Klein based his identification testimony solely on the fact he previously watched the video recordings. However, no evidence was provided to show how many times Detective Klein reviewed the video recordings. Detective Klein's position as the lead investigator and his interviews with the Haynes brothers failed to show he was familiar with the identity of defendant.

¶ 100        Besides the State providing testimony that defendant changed out of his clothing on the day of the shooting, there is no evidence defendant changed his appearance between the

- 28 -

date of the video recordings and trial. Also, there is no question the video recordings are clear. There is nothing in the record to show Detective Klein was more likely to correctly identify defendant than the jury. Therefore, we find his testimony was not admissible. Moreover, the trial court failed to engage in the precautionary procedures required for law enforcement witnesses.

¶ 101        Accordingly, we find the trial court committed a clear or obvious error in admitting Detective Klein's testimony as lay opinion identification testimony. Having found a clear or obvious error, we turn to whether the error amounted to first-prong plain error.

¶ 102                           b. First-Prong Plain Error

¶ 103        "Where the defendant claims first-prong plain error, a reviewing court must decide whether the defendant has shown that the evidence was so closely balanced the error alone severely threatened to tip the scales of justice." *Sebby*, 2017 IL 119445, ¶ 51. To determine "whether the evidence adduced at trial was close, a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *Id.* ¶ 53 (citing *Belknap*, 2014 IL 117094, ¶¶ 52-53). "A reviewing court's inquiry involves an assessment of the evidence on the elements of the charged offense or offenses, along with any evidence regarding the witnesses' credibility." *Id.* Throughout this inquiry, the burden of persuasion remains on the defendant. *People v. Nowells*, 2013 IL App (1st) 113209, ¶ 19, 1 N.E.3d 578.

¶ 104        Defendant argues the evidence is closely balanced where Detective Klein's improper identification of defendant, Carroll, and Hamer and his description of their actions in the video recordings tipped the scales of justice against defendant on the issue of whether he was the shooter. Defendant also argues the evidence was similarly close with regard to defendant's

unlawful use of a weapon conviction where the State mainly relied on defendant being the shooter to prove possession of the firearm. The State argues the evidence is not closely balanced based on the totality of the evidence. We agree with the State.

¶ 105    Even without Detective Klein's testimony identifying defendant in the video recordings, the video evidence is still compelling. The video recordings from Franzetti's Pantry depicts three males, one in a gray sweatshirt, move around inside the store. In the video recordings inside the store, the male with the gray sweatshirt appears to have a bulge in his sweatshirt pocket. Detective Klein testified the bulge could be a handgun. It was up to the jury to decide how much weight to give Detective Klein's opinion testimony.

¶ 106    Then, the video recordings show the three males exit the store. After the three men exited Franzetti's Pantry, they eventually take off running. The individual in the gray sweatshirt ran north, and the other two individuals ran northwest through a vacant parking lot and then across North Clinton Street. A short time later, the Haynes brothers appear in the video recording walking west on East Washington Street when you see them stop and duck.

¶ 107    Further, Khamahja testified the shots came from his "right side." Khamahja also told police the shooter wore a gray sweater. Moreover, Detective Ashbeck later recovered two shell casings at 221 North Clinton Street, near where the individual in the gray sweatshirt ran.

¶ 108    The jury also viewed defendant in the courtroom and watched defendant's February 26, 2019, police interview. In his interview, defendant admitted to being at Franzetti's Pantry on the day of the shooting. Defendant told Detective Engle he ran to "the crib" when he heard gunshots. Defendant denied that he changed his clothes after leaving Franzetti's.

¶ 109    Further, police found defendant in the apartment where they later located the firearm used in the shooting. Firearms expert Johnson tested and analyzed the physical evidence

and determined the shells and bullet were fired from the pistol recovered from the apartment at 706 East Jefferson Street. Police obtained a search warrant for the apartment and discovered no other individuals were inside besides defendant, Hamer, and Carroll. Besides finding Hamer's fingerprints on the weapon, all the evidence points to the man in the gray sweatshirt being the shooter.

¶ 110　　　　Based on the record, we find the totality of the evidence substantiates the commonsense assessment that this case was not closely balanced. Even without Detective Klein's identification testimony, the evidence present was more than sufficient to prove defendant was the same man in the video recordings wearing the gray sweatshirt and therefore, the shooter. Specifically, the jurors saw the extensive video evidence, watched defendant's interview, and learned that defendant was eventually found in the same location as the weapon used in the shooting. It logically flows that if defendant was the shooter, he possessed a firearm. Given the evidence in this case was not closely balanced, defendant fails to satisfy the first prong of plain error. See *Piatkowski*, 225 Ill. 2d at 565.

¶ 111　　　　　　　　　　　c. Ineffective Assistance of Counsel

¶ 112　　　　In the alternative, defendant argues his trial counsel was ineffective for failing to object to Detective Klein's lay witness opinion identification testimony and preserve the claim in his posttrial motion.

¶ 113　　　　We review claims of ineffective assistance of counsel under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To succeed on a claim of ineffective assistance of counsel, defendant must show (1) the attorney's performance fell below an objective standard of reasonableness and (2) the deficient performance prejudiced the defendant. *Id.* at 687.

¶ 114    Both prongs of the *Strickland* test must be satisfied; therefore, a finding of ineffective assistance of counsel is precluded if a defendant fails to satisfy one of the prongs. *People v. Simpson*, 2015 IL 116512, ¶ 35, 25 N.E.3d 601. "A court may resolve a claim of ineffective assistance of counsel by reaching only the prejudice prong, as a lack of prejudice renders irrelevant the issue of counsel's alleged deficient performance." *People v. Hall*, 194 Ill. 2d 305, 337-38, 743 N.E.2d 521, 540 (2000). Prejudice results when there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceedings would have been different. *People v. Simms*, 192 Ill. 2d 348, 362, 736 N.E.2d 1092, 1106 (2000).

¶ 115    We find trial counsel's failure to object to Detective Klein's lay witness opinion identification testimony and preserve the claim in his posttrial motion did not prejudice defendant. As stated above, the totality of the evidence was more than sufficient to prove defendant was the shooter and possessed the firearm. Absent Detective Klein's testimony identifying defendant in the video recordings, there is no reasonable probability the result of the proceedings would have been different. Therefore, we find defendant's ineffective assistance of counsel claim fails.

¶ 116                    C. Ineffective Assistance of Counsel

¶ 117    Defendant next argues ineffective assistance of trial counsel where his counsel failed to file a motion to sever the charge of unlawful use of a weapon by a felon from the two counts of reckless discharge of a firearm and one count of mob action. At trial, the parties presented a joint stipulation informing the jury that defendant had a prior felony conviction in McLean County case No. 16-CF-864. The prior crime was not disclosed to the jury, only the fact of a prior conviction. According to defendant, if his counsel had sought severance, it is likely such motion would have been granted, then the jury on the two counts of reckless

discharge of a firearm would not have learned that he had a prior felony conviction. The State argues trial counsel did not err where the decision to not file a motion to sever was a matter of trial strategy.

¶ 118     As stated above, to succeed on a claim of ineffective assistance of counsel, defendant must show (1) the attorney's performance fell below an objective standard of reasonableness and (2) the deficient performance prejudiced the defendant. *Strickland*, 466 U.S. at 687. "We must show great deference to the attorney's decisions as there is a strong presumption that any attorney has acted adequately." *People v. Moore*, 2012 IL App (1st) 100857, ¶ 43, 964 N.E.2d 1276 (citing *Strickland*, 466 U.S. at 689).

¶ 119     "Two or more offenses may be charged in the same indictment, information or complaint in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are based on the same act or on 2 or more acts which are part of the same comprehensive transaction." 725 ILCS 5/111-4(a) (West 2018). "If it appears that a defendant or the State is prejudiced by a joinder of related prosecutions or defendants in a single charge or by joinder of separate charges or defendants for trial the court may order separate trials, grant a severance of defendants, or provide any other relief as justice may require." 725 ILCS 5/114-8(a) (West 2018). Here, defendant was charged by indictment with two counts of reckless discharge of a firearm, one count of mob action, and one count of unlawful use of a weapon by a felon.

¶ 120     "Generally, a defense decision not to seek a severance, although it may prove unwise in hindsight, is regarded as a matter of trial strategy." *People v. Fields*, 2017 IL App (1st) 110311-B, ¶ 24, 75 N.E.3d 503; see also *People v. Poole*, 2012 IL App (4th) 101017, ¶ 10, 972 N.E.2d 340. Further, "an attorney's failure to pursue a motion to sever cannot amount to

ineffective assistance where, even if presented, the motion would have been unsuccessful." *People v. Bock*, 242 Ill. App. 3d 1056, 1080, 611 N.E.2d 1173, 1189 (1993).

¶ 121 To show defense counsel's failure to file a motion to sever was not sound trial strategy, defendant cites *People v. Utley*, 2019 IL App (1st) 152112, 142 N.E.3d 352. In *Utley,* the defendant faced charges of possession of a controlled substance with intent to deliver, being an armed habitual criminal, and unlawful use of a weapon by a felon. *Id.* ¶ 1. Defense counsel did not move to sever the gun counts from the drug counts and tried them all together in one proceeding. *Id.* Counsel also failed to try to limit what the State could introduce to prove-up the defendant's prior offenses by either filing a motion *in limine* or stipulating to the predicate felonies. *Id.* ¶ 48.

¶ 122 The defendant appealed, arguing trial counsel provided ineffective assistance by not moving to sever the charges where "to prove the gun charges, the State was required to introduce evidence of defendant's prior convictions for aggravated battery with a firearm and delivery of a controlled substance, neither of which would have been admissible to prove the possession of a controlled substance offense." *Id.* ¶ 39. The appellate court held that counsel was ineffective for failing to move to sever defendant's unlawful use of a weapon by a felon charge from his drug charges. *Id.* ¶ 53. Specifically, the court found counsel's failure to move to sever did not amount to trial strategy since the names of the predicate offenses were provided to the jury and counsel made no attempt to minimize the prejudice. *Id.* ¶ 48. We find *Utley* distinguishable.

¶ 123 Here, the evidence presented at trial to prove defendant guilty of unlawful possession of a weapon by a felon and reckless discharge of a firearm would essentially be the same. Both charges were based on the same comprehensive transaction or occurrence. But for

the prior felony conviction, the evidence presented for each offense would involve the same witness testimony and physical evidence. Further, the parties presented a joint stipulation to the jury establishing that defendant had a prior felony conviction in McLean County case No. 16-CF-864. The prior crime was not disclosed to the jury, only the fact of a prior conviction.

¶ 124    Our case is analogous to *Fields*, 2017 IL App (1st) 110311-B. The *Fields* court opined that "when deciding whether to seek a severance, defense counsel may choose to pursue an 'all or nothing' trial strategy, in which the defendant is acquitted or convicted of all charges in a single proceeding." *Id.* ¶ 28. "The mere fact that an 'all or nothing' strategy proved unsuccessful does not mean counsel performed unreasonably and rendered ineffective assistance." *Id.* In *Fields*, the reviewing court observed that "while an 'all or nothing' strategy required exposing the jury hearing the armed robbery charge to prejudicial information it would not have heard if the cases had been severed, the stipulation to the mere fact of the conviction mitigated the prejudice to defendant." *Id.* The court reasoned that defense counsel may have believed that the odds were greater to get two acquittals in one proceeding instead of two separate proceedings. *Id.* For this reason, the court held the defendant failed to overcome the presumption that defense counsel's action was the product of sound trial strategy and rejected defendant's ineffective assistance of counsel claim. *Id.*

¶ 125    We agree with the reasoning in *Fields*. Here, defense counsel opted to try all charges together and relied on the circumstantial evidence to try and prove defendant was not the shooter and did not possess a weapon. Counsel's trial strategy indicated an "all or nothing" approach, and we cannot find this strategy fell below an objective standard of reasonableness. Further, the stipulation to the prior conviction did not disclose what the prior felony was for. Thus, where the jury never learned that defendant was previously convicted of aggravated

battery, any potential prejudice was greatly reduced. For the reasons stated, we find defendant's claim of ineffective assistance fails.

¶ 126                                    D.  Mandatory Supervised Release

¶ 127          Last, defendant argues the trial court improperly ordered him to serve a two-year term of MSR for unlawful use of a weapon by a felon. The State concedes the court lacked authority to impose a two-year term of MSR, and thus, a new sentencing order should be issued reflecting a one-year term of MSR for unlawful use of a weapon by a felon. We accept the State's concession.

¶ 128          A trial court has no discretion when it comes to imposing a statutorily mandated MSR term. *People ex rel. Berlin v. Bakalis*, 2018 IL 122435, ¶ 18, 106 N.E.3d 979. The imposition of a statutorily unauthorized sentence affects substantial rights, which may be considered by a reviewing court even if not properly preserved in the trial court. *People v. Hicks*, 181 Ill. 2d 541, 544-45, 693 N.E.2d 373, 375 (1998).

¶ 129          Here, it is undisputed that defendant's two reckless discharge of a firearm convictions constituted Class 4 felonies and his unlawful use of a weapon by a felon conviction constituted a Class 3 felony. Under sections 5-4.5-40 and 5-4.5-45 of the Unified Code of Corrections (730 ILCS 5/5-4.5-40, 5-4.5-45 (West 2018)), defendant's offenses carry a term of one-year MSR. Given the one-year MSR was statutorily mandated, the trial court in this case had no discretion but to impose that term on defendant. See *Berlin*, 2018 IL 122435, ¶ 18 (citing *Round v. Lamb*, 2017 IL 122271, ¶ 16, 90 N.E.3d 432). Accordingly, as the State correctly concedes, a new sentencing order reflecting a one-year term of MSR for defendant's unlawful use of a weapon by a felon conviction should be issued.

¶ 130                                         III. CONCLUSION

¶ 131　　　　For the reasons stated, we affirm in part, vacate in part, and remand with directions.  We vacate defendant's term of MSR for unlawful use of a weapon by a felon and remand for the issuance of a new sentencing order reflecting a one-year term of MSR for unlawful use of a weapon by a felon.

¶ 132　　　　Affirmed in part and vacated in part; cause remanded with directions.